24-2504
*In re: Kwok*

# United States Court of Appeals
# For the Second Circuit

August Term 2025

Argued: December 10, 2025
Decided: April 6, 2026

No. 24-2504

---

IN RE: KWOK

HO WAN KWOK,

*Debtor*,

MEI GUO,

*Counter-Defendant-Appellant*,

HK INTERNATIONAL FUNDS
INVESTMENTS (USA) LIMITED, LLC,

*Plaintiff-Counter-Defendant-Appellant*,

v.

LUC A. DESPINS, Chapter 11 Trustee,

*Defendant-Counter-Claimant-Appellee,*

UNITED STATES TRUSTEE,

*Trustee.*[1]

---

Appeal from the United States District Court
for the District of Connecticut
No. 23-cv-458, Kari A. Dooley, *Judge*.

---

Before: CHIN, SULLIVAN, and LEE, *Circuit Judges*.

Mei Guo and HK International Funds Investments (USA) Limited, LLC ("HK") – third parties in a Chapter Eleven bankruptcy filed by an individual debtor – appeal from a judgment of the United States District Court for the District of Connecticut (Dooley, *J.*) affirming the bankruptcy court's conclusion that HK was an alter ego of the debtor and that HK's assets therefore belonged to the bankruptcy estate. On appeal, Guo and HK argue that the Trustee did not have standing to assert the alter-ego claim on behalf of the bankruptcy estate's creditors and that, in any event, HK was not the debtor's alter ego.

As an initial matter, we conclude that we have jurisdiction to hear this appeal. Although the district court's decision was not final when this appeal was filed, the Trustee agreed during oral argument to dismiss his remaining claims with prejudice, making the district court's summary judgement decision an appealable final order. Turning to the merits, we agree with the district court that the Trustee has standing to assert an alter-ego claim on behalf of the creditors and that the only reasonable conclusion to be drawn from the record is that HK is the debtor's alter ego. Accordingly, we **AFFIRM** the judgment of the district court.

AFFIRMED.

> STEPHEN M. KINDSETH (James M. Moriarty, Daniel A. Byrd, *on the brief*), Zeisler & Zeisler, P.C., Bridgeport, CT, *for Counter-*

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

*Defendant-Appellant and Plaintiff-Counter-Defendant-Appellant.*

NICHOLAS BASSETT (Dennis M. Carnelli, Neubert, Pepe & Monteith, P.C., New Haven, CT, *on the brief*), Paul Hastings, LLP, Washington, D.C., *for Defendants-Appellants.*

RICHARD J. SULLIVAN, *Circuit Judge*:

Mei Guo and HK International Funds Investments (USA) Limited, LLC ("HK") – third parties in a Chapter Eleven bankruptcy filed by an individual debtor – appeal from a judgment of the United States District Court for the District of Connecticut (Dooley, *J.*) affirming the bankruptcy court's conclusion that HK was an alter ego of the debtor and that HK's assets therefore belonged to the bankruptcy estate. On appeal, Guo and HK argue that the Trustee did not have standing to assert the alter-ego claim on behalf of the bankruptcy estate's creditors and that, in any event, HK was not the debtor's alter ego.

As an initial matter, we conclude that we have jurisdiction to hear this appeal. Although the district court's decision was not final when this appeal was filed, the Trustee agreed during oral argument to dismiss his remaining claims with prejudice, making the district court's summary judgment decision an appealable final order. Turning to the merits, we agree with the district court that

3

the Trustee has standing to assert an alter-ego claim on behalf of the creditors and that the only reasonable conclusion to be drawn from the record is that HK is the debtor's alter ego. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

This case involves a mega-yacht and a Pomeranian. Both allegedly belong to the debtor in the underlying bankruptcy, the "self-declared multi-billionaire" Ho Wan Kwok. J. App'x at 546. But while Kwok listed the Pomeranian as his property in his bankruptcy petition, he claims not to own the yacht, a Cayman-Islands-registered boat called the *Lady May*, which is worth tens of millions of dollars.

The *Lady May* officially belongs to HK (one of the Appellants here), a limited liability company whose only member is Kwok's daughter, Mei Guo (the other Appellant). HK has no place of business and its paperwork lists only Kwok's home and office addresses, the latter of which Kwok used for several other entities that he controlled. HK also (i) has no revenue, bank accounts, officers, directors, or employees; (ii) maintains no records, other than those related to the *Lady May*; and (iii) "ha[s] no business purpose other than owning the *Lady May*" and a smaller vessel called the *Lady May II*, which is worth roughly $1,000,000 and is

4

alternatively described as "another yacht" and "a small 'runner' boat for the *Lady May*." Sp. App'x at 44, 57, 77.

In 2020, one of Kwok's creditors, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), sought to enforce a roughly $116,000,000 New York State Supreme Court judgment by levying on the *Lady May*. The *Lady May* subsequently sailed to the Bahamas – even though the New York Supreme Court had issued a restraining order requiring the ship to stay within its jurisdiction. PAX accordingly moved for contempt, and the state court held a hearing at which Guo insisted that the *Lady May* belonged to her, making it unfair to penalize Kwok for the yacht's movements.

The state court disagreed. It explained that "Guo's testimony was . . . internally inconsistent and dissembling," and that the evidence showed that Kwok "control[led] the yacht, . . . provided the funds to purchase it[,] and . . . principally enjoy[ed its] use." J. App'x at 553–54. It therefore held Kwok in contempt, emphasizing that he had attempted to "avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members," and that "[t]he machinations associated with th[is] shell

5

game" were "of a piece with every other evasive and contemptuous act" he had taken throughout the litigation. J. App'x at 546, 552.

Roughly a week later, in February 2022, Kwok filed for bankruptcy. In his bankruptcy forms, he claimed to own a handful of electronic appliances, a cell phone, clothing, a few thousand dollars in tax-refund and COVID-relief checks, and a Pomeranian – but not the *Lady May*. PAX responded by asking the bankruptcy court to permit the New York contempt proceedings to go forward, despite the automatic stay that the Chapter Eleven petition had triggered. While that motion was pending, Kwok proposed a draft plan to settle the bankruptcy proceedings, under which "HK USA [would] transfer" the *Lady May* to his creditors. J. App'x at 138. And at around the same time, HK also entered the bankruptcy fray, initiating an adversary proceeding in which it claimed that it was the true owner of the *Lady May*.

Meanwhile, the U.S. Trustee asked the bankruptcy court to appoint a Chapter Eleven trustee to oversee the bankruptcy estate. The Trustee explained that it had "concerns about the odd combination of what appears to be artificial self-created poverty by the Debtor to insulate himself from creditors and the Debtor's filing of this case to obtain protection from creditors owed millions." *In*

*re Kwok*, 640 B.R. 514, 517 (Bankr. D. Conn. 2022) (internal quotation marks omitted).

Before the bankruptcy court ruled on the U.S. Trustee's motion, the parties settled PAX's motion to exempt the New York proceedings from the automatic stay; PAX agreed to drop its request to lift the stay, and HK promised to bring the *Lady May* back to "the navigable waters of Connecticut" – within the jurisdiction of the bankruptcy court – and to place $37,000,000 in escrow as a guarantee. J. App'x at 166. HK obtained this money from a British-Virgin-Islands-based entity called Himalaya International Financial Group ("Himalaya"), which, as later litigation revealed, Kwok controlled. The bankruptcy court entered the proposed stipulation, and, a few months later, it separately granted the U.S. Trustee's motion to appoint a Chapter Eleven trustee.

When the dust from this flurry of motions cleared, a new Chapter Eleven Trustee (the Appellee here) was presiding over the bankruptcy estate, and HK had three assets: the *Lady May*, the *Lady May II*, and $37,000,000 in escrow. The Trustee accordingly filed counterclaims against HK in its adversary proceeding, asserting that (i) the New York court's findings in the contempt proceeding estopped HK from arguing that it (and not Kwok) owned the *Lady May*; and (ii) in any event,

7

HK was Kwok's alter ego, meaning that all three of its assets belonged to the bankruptcy estate. The Trustee also brought counterclaims for fraudulent transfer and equitable ownership relating to the assets.

The bankruptcy court granted summary judgment to the Trustee on his collateral-estoppel and alter-ego counterclaims. HK and Guo then appealed to the district court, which exercised its discretionary jurisdiction over interlocutory bankruptcy appeals, *see* Sp. App'x at 81–83 (citing 28 U.S.C. § 158(a)), and affirmed both orders, explaining that there was "no genuine issue of material fact that HK . . . [was Kwok's] alter ego," that HK was separately estopped from relitigating "the issue of the ownership of the *Lady May*" because there was no "genuine issue of material fact that Appellants [had] a full and fair opportunity to litigate th[at] issue" in the state-court proceeding, and that this "collateral[-]estoppel finding [was] not necessary to the alter[-]ego determination," *id.* at 86, 90. Appellants timely appealed.

## II. DISCUSSION

Because "the district courts [in bankruptcy cases] have jurisdiction to hear appeals from interlocutory orders in instances where the courts of appeals do not," we must first "determine the jurisdictional basis of [the] matter before us." *In re*

8

*Chateaugay Corp.*, 922 F.2d 86, 89 (2d Cir. 1990).  We hold that we have jurisdiction here, and that the district court correctly granted summary judgment on the Trustee's alter-ego claim – thus mooting his collateral-estoppel claim.

## A.  Jurisdiction

"In every appeal . . . 'the first and fundamental question is that of jurisdiction.'"  *Marquez v. Silver*, 96 F.4th 579, 582 (2d Cir. 2024) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).  We are "bound to ask and answer" this question for ourselves, "even when [it is] not otherwise suggested."  *Id.* (quoting *Steel Co.*, 523 U.S. at 94).

As a general matter, 28 U.S.C. § 158(d) vests us with "'jurisdiction of appeals from all final decisions, judgments, orders, and decrees' of district courts reviewing decisions of bankruptcy courts."  *In re Delaney*, 110 F.4th 565, 567 (2d Cir. 2024) (quoting 28 U.S.C. § 158(d)(1)).  When this appeal was filed, the district court decision was not final because the Trustee's remaining counterclaims were still technically pending in the bankruptcy court.  *See Chateaugay Corp.*, 922 F.2d at 90 ("An order granting partial summary judgment is interlocutory.").  But "when fewer than all of a plaintiff's claims have been dismissed, the plaintiff may secure immediate appellate review of the dismissals by definitively agreeing to

9

forgo pursuit of the claims that remain pending." *Zivkovic v. Laura Christy LLC*, 137 F.4th 73, 82 (2d Cir. 2025) (discussing 28 U.S.C. § 1291); *see also In re AroChem Corp.*, 176 F.3d 610, 618 (2d Cir. 1999)) (explaining that section 1291's "general grant of appellate jurisdiction" is "similar" to section 158(d)).  At oral argument, the Trustee agreed to dismiss his remaining claims with prejudice.  We accordingly have jurisdiction.  *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 (2d Cir. 2015) (concluding that jurisdiction existed because party "agreed to a dismissal of his remaining claim . . . with prejudice" at oral argument).

## B.  Merits

On the merits, Appellants argue that the district court improperly affirmed the bankruptcy court's order ruling that HK was Kwok's alter ego and reverse-piercing HK's corporate veil.  In particular, Appellants contend that (i) the Trustee lacked standing under the Bankruptcy Code to bring his reverse veil-piercing claim; and (ii) genuine disputes as to issues of material fact precluded summary judgment.

"When a bankruptcy appeal reaches us after district court review of the bankruptcy court order, our review of the bankruptcy court order is plenary," and we "independently . . . evaluat[e] [its] legal conclusions *de novo* and its factual

10

findings for clear error." *In re N. New England Tel. Operations LLC*, 795 F.3d 343, 346 (2d Cir. 2015) (internal quotation marks omitted). We accordingly "review a grant of summary judgment *de novo,* taking all factual inferences in favor of the non-moving party." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998). We address each of Appellants' arguments in turn.[2]

> 1. The Trustee has Standing to Bring the Veil-Piercing Claim.

"Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded [both] on the rights of the debtor and on certain rights of the debtor's creditors." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995) (internal quotation marks omitted). To assert the debtor's rights, trustees generally must invoke section 541 of the Code – which sweeps "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case" into the estate administered by the trustee. *In re Nordlicht*, 115 F.4th 90, 104 (2d Cir. 2024) (quoting 11 U.S.C. § 541(a)(1)). Trustees may also pursue the "rights of the debtor's creditors" by turning to other sections of the

---

[2] As the district court correctly noted, the Trustee's collateral-estoppel counterclaim "[will] be rendered moot if the order granting summary judgment on the [alter-ego] counterclaim is affirmed," because piercing HK's corporate veil would win the Trustee all of HK's assets – including the yacht at issue in the collateral-estoppel order. Sp. App'x at 81 n.2.

Code, including section 544. *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) (citing 11 U.S.C. § 544).[3]

"Section 544(a) of the Code, the 'strong-arm' clause, enables the trustee in bankruptcy to act as a hypothetical lien creditor as of the day the bankruptcy case is filed." *In re Kors, Inc.*, 819 F.2d 19, 22 (2d Cir. 1987). That section expressly vests the trustee with the "rights and powers" of "a creditor that extend[ed] credit to the debtor at the time of the commencement of the case, and that obtain[ed], at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists." 11 U.S.C. § 544(a). In other words, section 544(a) permits the trustee to assert any generalized claims that would belong to a hypothetical high-priority lien creditor.

To evaluate such claims, we must determine whether "state law would allow . . . a supposed or hypothetical creditor of the debtor" to bring them. *In re Vienna Park Props.*, 976 F.2d 106, 115 (2d Cir. 1992) (internal quotation marks

---

[3] Here, the Trustee pursues claims under both sections 541 and 544. The parties spend much energy debating questions related to the Trustee's standing under section 541 – including whether a debtor may assert so-called insider reverse veil-piercing claims, and whether creditors' claims may also belong derivatively to the bankruptcy estate. But we need not reach the issue of the Trustee's standing under section 541 because we conclude that the Trustee may assert the claims at issue here under section 544.

omitted). Here, that state is Delaware, since HK is incorporated there and "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). Delaware law recognizes outsider reverse veil-piercing claims, which are "implicated where an outside third party, frequently a creditor, urges a court to render a company liable on a judgment against" an insider. *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 710 (Del. Ch. 2021) (internal quotation marks omitted).[4] That is exactly the kind of claim that the Trustee brings here: by stepping into the third-party creditors' shoes under section 544, the Trustee invokes those creditors' rights to make HK pay for Kwok's debts.

Appellants challenge the Trustee's ability to bring these claims on two principal grounds. *First*, they contend that Delaware law applies reverse veil-piercing "only to owners of a business organization." Appellants' Br. at 41 (internal quotation marks omitted). Appellants insist that because Kwok does not

---

[4] By contrast, Delaware law has neither "endors[ed] [n]or reject[ed]" insider reverse veil-piercing, which allows a "controlling member" to "disregard the corporate entity that otherwise separates the member from the corporation." *Manichaean*, 251 A.3d at 714 n.118, 710 (alterations and internal quotation marks omitted). Because the Trustee relies on the rights of (outsider) creditors under section 544, we need not consider whether the Trustee may also assert insider claims on behalf of Kwok himself.

technically *own* HK, the Trustee cannot access HK's assets through Kwok. To support this argument, Appellants rely on a stray line from *Manichaean*, where the Court of Chancery explained that "reverse veil-piercing involves the imposition of liability on a business organization for the liabilities of its *owners*." 251 A.3d at 710 (emphasis added). But that line merely used a textbook example to summarize reverse veil-piercing "[a]t its most basic level," without purporting to strictly limit the scope of that doctrine. *Id.* And far from adopting a formalistic rule, the court subsequently stressed that "reverse veil-piercing, like traditional veil-piercing, is rooted in equity, and the court must consider all relevant factors . . . to reach an equitable result." *Id.* at 715. *Manichaean* thus does not support the rigid theory of reverse veil-piercing on which Appellants depend.

*Second*, Appellants argue that our decision in *Shearson Lehman Hutton, Inc. v. Wagoner* requires us to read section 544 more narrowly. 944 F.2d 114 (2d Cir. 1991). There, we explained that "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* at 118. Ignoring the plain text of section 544, Appellants contend that we should interpret that section as "serv[ing] certain limited purposes" – including "allow[ing] . . . the trustee . . . to cut off any secret

14

or unperfected liens on debtor property," Appellants' Br. at 32–33 (internal quotation marks omitted) – because any other reading would conflict with *Wagoner*.

But section 544 can coexist with *Wagoner* because that statute does not allow trustees to assert just *any* creditor claim.[5] Instead, courts must distinguish between "general" and "personal" claims. *Nordlicht*, 115 F.4th at 105 (discussing section 541). "If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim." *St. Paul Fire*, 884 F.2d at 701. This approach promotes the "equitable distribution [of assets] among creditors" by "allow[ing] the trustee to exercise the 'strong arm' power and recover corporate assets for the benefit of all creditors of the corporation," thus preventing a race for assets in which the savviest creditors would reap the greatest rewards. *Nordlicht*, 115 F.4th at 05 (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir. 1986)). By contrast, creditors – not the trustee – "are exclusively entitled to pursue

---

[5] *Wagoner* also did not involve or attempt to interpret section 544: the trustee had "insist[ed]" that "he [was] not asserting the claims of the [creditors]," and we accordingly found it "unnecessary for us to delve deeply into when, if ever, a trustee may sue a third party on behalf of the bankrupt's creditors." 944 F.2d at 118.

personal claims," which belong only to specific sets of creditors harmed in particular ways. *Id.* (internal quotation marks omitted and alteration adopted).[6] Put simply, the *Wagoner* rule bars trustees from asserting personal-creditor claims, while section 544 allows them to pursue general causes of action that would benefit *any* hypothetical creditor.

Appellants argue that *St. Paul Fire* does not control this case because there we merely concluded that "an alter ego claim may be asserted by [a] debtor corporation" under Ohio law. Appellants' Br. at 36 (quoting *St. Paul Fire*, 884 F.2d at 695). As such, the claim at issue in *St. Paul Fire* was "property of the estate" itself under section 541 – not a separate claim that "rel[ied] upon the ability of the trustee [to] stand[] in the shoes of the creditors" under section 544. *Id.* at 37.

But *St. Paul Fire*'s reasoning stretches further than that. There, we explained that the trustee could properly bring the cause of action at issue *either* if that claim was "property of the debtor," or if it was "otherwise properly asserted by the bankruptcy trustee." *St. Paul Fire*, 884 F.2d at 702. And we expressly endorsed

---

[6] *Wagoner*, like the other cases that Appellant cites, involved particularized claims – not general ones. *See* 944 F.2d at 119–20; *see also Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 96 (S.D.N.Y. 2011) ("[T]he Trustee's claims are not being brought on behalf of all [the debtor's] creditors, and could not be brought by any given one of them."); *Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416, 416 (1972) (claims asserted "on behalf of persons holding [specific] debentures").

*Koch Refining v. Farmers Union Central Exchange, Inc.*, where the Seventh Circuit held that the trustee "has creditor status under section 544 to bring suits for the benefit of the estate and ultimately of the creditors," and that "[alter ego] allegations that could be asserted by *any* creditor could be brought by the trustee as a representative of *all* creditors." 831 F.2d 1339, 1348–49 (7th Cir. 1987) (emphases added); *see St. Paul Fire,* 884 F.2d at 704. Finally, we cited section 544 itself when discussing the trustee's power to invoke "certain rights of the debtor's creditors." *Id.* at 700. *St. Paul Fire* thus shows that trustees may assert generalized alter-ego claims *either* under section 544 or – if those claims also belong to the estate itself – under section 541.

That leaves us with one final task: to determine whether the claims at issue here are general or personal. The answer is clear – "reverse veil-piercing claim[s] [are] . . . general." *Nordlicht*, 115 F.4th at 108–09 (analyzing New York reverse veil-piercing doctrine similar to Delaware law). Such claims "increas[e] the basket of assets that could be used to satisfy *any and all liabilities* owed by the debtor." *Id.* at 108 (alterations adopted and internal quotation marks omitted). As such, they are general claims that enlarge the size of the bankruptcy estate for all creditors – not particular claims that only certain subsets of creditors could assert. Because a

hypothetical creditor could bring these generalized claims against HK, the Trustee may also do so under section 544(a). *See id.* at 100 & n.4 (trustee settled reverse veil-piercing claims by "exercising [section 544] power" to "amass[] . . . estate assets for a *pro rata* distribution to all creditors" (quoting *Koch*, 831 F.2d at 1352)).

2. HK is Kwok's Alter Ego.

A bankruptcy court may grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056. While the movant must "demonstrate the absence of a genuine issue of material fact," it need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). And if a movant carries its burden, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

When reviewing reverse-veil piercing claims, Delaware courts begin by weighing "the traditional factors" for "traditional veil-piercing claim[s]," which "include insolvency, undercapitalization, commingling of corporate and personal

18

funds, the absence of corporate formalities, and whether the subsidiary is simply a facade for the owner." *Manichaean*, 251 A.3d at 714. "The court should then ask whether the owner is utilizing the corporate form to perpetuate fraud or an injustice" by considering the following eight factors:

> (1) [whether] allowing a reverse pierce would impair the legitimate expectations [of innocent shareholders;] (2) the degree to which the corporate entity whose disregard is sought has exercised dominion and control over the insider who is subject to the claim[;] (3) the degree to which the injury . . . is related to the corporate entity's dominion and control of the insider, or to that person's reasonable reliance upon a lack of separate entity status between the insider and the corporate entity[;] (4) the public convenience[;] (5) the extent and severity of the wrongful conduct[;] (6) the possibility that the person seeking the reverse pierce is himself guilty of wrongful conduct[;] (7) the extent to which the reverse pierce will harm innocent third-party creditors[;] and (8) the extent to which other claims or remedies are practically available to the creditor.

*Id.* at 714–15 (internal quotation marks omitted). Applying those factors here, we agree that HK is Kwok's alter ego.

Several undisputed facts lead us to that conclusion. For starters, the traditional veil-piercing factors suggest that HK was a shell company. As the bankruptcy court recognized, HK had no revenue; it hired no directors, officers, or employees; it neither filed tax returns nor maintained a bank account; it kept no

records other than those related to the *Lady May*; and it pursued no business (other than owning the *Lady May* and the *Lady May II*).  Meanwhile, Kwok himself – not Guo – primarily sailed on the *Lady May*; HK's office also housed Kwok's lawyers and other entities connected to Kwok; Kwok used HK's address when he filled out his own bankruptcy petition; and Kwok initially proposed a reorganization plan that would have liquidated the *Lady May*.  HK thus was insolvent and undercapitalized, it failed to observe corporate formalities, and it served as "a façade" for Kwok.  *Id.* at 714.

Kwok also used HK's corporate form to "perpetuate fraud [and] injustice." *Id.* at 715.  Borrowing from the fraudulent-transfer context, the bankruptcy court pointed to several traditional badges of fraud that raised red flags here.  These include whether a business organization is suspiciously "closely[ ]held," whether there is a "family . . . relationship between the parties," and whether the transferor continues to "possess[], benefit [from,] or use . . . the property in question." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (internal quotation marks omitted).

Here, HK is closely held, Guo is Kwok's daughter, and Kwok enjoyed the benefits of the *Lady May* when he cruised the high seas on it.  Furthermore, the *Manichean* factors point in the same direction:  Guo has no "legitimate

20

expectations" in any of HK's assets because it is a façade for Kwok; Kwok exercised dominion and control over HK; the public convenience favors preventing the injustice of shielding HK's assets; the reverse veil-pierce will help Kwok's creditors recover the funds owed to them; and HK's creditor, Himalaya, which Kwok also appears to have controlled, should have known that it risked losing its assets by lending them to what was at least arguably a shell company in the midst of its controller's bankruptcy.

Appellants resist this logic by urging us to interpret the facts as narrowly as possible. They contend, among other things, that nothing in Delaware law affirmatively requires HK to have directors, officers, employees, or a bank account; that the record definitively shows only that Kwok used the *Lady May* for "three months in the summer of 2020," Appellants' Br. at 48; and that Guo offered her father a multimillion-dollar yacht to assist him in his bankruptcy proceedings and obtain a release for herself.

But "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory . . . or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). Here, the Trustee presented a mountain of

21

evidence suggesting that HK was Kwok's alter ego. Appellants cannot brush that mountain aside merely by presenting their own far-fetched and unsupported explanations of the facts; they instead must provide evidence that supports a contrary conclusion.[7] *See Matsushita*, 475 U.S. at 586–87.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court granting the Trustee's motion for summary judgment.

---

[7] Guo and HK also argue that the bankruptcy court's alter ego finding depended on its earlier collateral-estoppel finding. But as the district court correctly noted, "undisputed facts in the record" independently supported the bankruptcy court's alter ego analysis. Sp. App'x at 84.